# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0489**

| | |
|---|---|
| CAROLINE ALLEN,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: September 14, 2026 |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Dorian Hurley, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On January 21, 2021, Petitioner, Caroline Allen, filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine received on October 1, 2020. Petition at 1; Amended Petition at 1 (ECF No. 25). The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner more likely than not suffered the residual effects of her vaccine-related injury for more than six months, and that she

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

has satisfied all of the requirements for a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I. Relevant Procedural History

Respondent filed his Rule 4(c) Report on November 13, 2023, contending that Petitioner has failed to satisfy the statutory severity requirement. Rule 4(c) Report at 15-18. Petitioner subsequently filed a Brief Regarding Entitlement ("Br.") on March 21, 2025. ECF No. 38. Respondent filed a response ("Resp.") on May 6, 2025. ECF No.39. The matter is ripe for resolution.

## II. Relevant Facts

Petitioner received a flu vaccine in her left shoulder on October 1, 2020. Ex. 5 at 80. She had a prior history of neck pain, and muscle spasm that had radiated to her shoulders. *See e.g.*, Ex. 6 at 11; Ex. 13 at 43, 46.

Petitioner sent a message to her primary care provider ("PCP") the day after her vaccination to report that she had pain when raising both arms.[3] Ex. 5 at 72. A nurse advised her that it was normal to have pain for a few days. *Id*. at 73. Petitioner wrote again on October 7, 2021 (now six days after her vaccination), stating that she was "still having arm pain from the injection in [her] left arm." *Id*. at 70-71. She had a video visit with a nurse that same day during which Petitioner was diagnosed with an allergic reaction and prescribed oral prednisone. *Id*. at 64.

Petitioner reached out to her PCP again on October 15, 2020. Ex. 5 at 61. She reported that the steroids had helped her pain, but that the pain returned. *Id*. She had an in-person appointment on October 20, 2020 (now 19 days after vaccination).[4] *Id.* at 52. Petitioner was prescribed naproxen and prednisone and referred to physical therapy. *Id*. at 51, 55.

Petitioner was evaluated by an occupational therapist ("OT") on October 29, 2020. Ex. 5 at 33. She reported having a "flu shot on 10/1/20 in the left arm and . . . having aching, throbbing, constant pain ever since." *Id*. She believed she was referred to therapy for an injection and expressed frustration when told that therapists do not provide injections. *Id*. On exam, she has nearly full range of motion, other slightly below normal external rotation, and reduced strength in her left shoulder. *Id*. at 34. Impingement tests

[3] Petitioner received another vaccination in her right shoulder on the same date. Ex. 5 at 80.

[4] The medical record for this visit references, right shoulder pain from the flu vaccine, rather than left shoulder pain. Ex. 5 at 52. However, this appears to be an error as the appointment was scheduled in reference to Petitioner's complaints about left shoulder pain and resulted in therapy for her left shoulder. *See* Ex. 5 at 33-35; 60.

were positive. *Id*. She was encouraged to attend therapy 2-3 times per week for 4-6 weeks, but declined and indicated that she could attend only once every two weeks. *Id*. at 35.

After her OT evaluation on October 29, 2020, Petitioner had a walk-in encounter regarding her shoulder pain. Ex. 5 at 47. She repeated that she had believed the OT appointment to be for a shoulder injection and requested both an MRI and an injection. *Id*. She was referred for x-rays and to an orthopedist. *Id*. The x-ray revealed "minimal superior subluxation at the AC joint, potentially due to age indeterminate grade 2 AC joint injury" and "likely calcific tendinosis of the rotator cuff tendon insertion." *Id*. at 46-47.

An MRI performed on November 11, 2020, revealed an "8mm focus of calcific tendinitis overlying anterior edge of supraspinatus tendon" and prominent bursal fluid/bursitis. Ex. 4 at 18.

Petitioner saw an orthopedist on November 17, 2020. Ex. 4 at 2. She reported left shoulder pain after a flu vaccine that "occurred six weeks ago." *Id*. On exam, she had full active and passive range of motion, but "with pain above 90 degrees of forward flexion and abduction." *Id*. The doctor diagnosed subacromial impingement with rotator cuff bursitis and calcific tendinitis. *Id*. at 3. Petitioner received a cortisone injection and home exercises. *Id*.

Ms. Allen returned to the orthopedist on December 8, 2020, reporting that the first injection had not provided relief, and that she was experiencing ongoing "severe pain." *Id*. at 4. On exam, she "demonstrate[ed] active forward flexion only to 30 degrees," but which expanded to full passive motion "with encouragement." *Id*. He noted "significant pain when lowering the arm" and diffuse tenderness with palpation. *Id*. Petitioner was diagnosed with calcific tendinitis, prescribed Tramadol for pain, given a second cortisone injection, and referred to physical therapy. *Id*.

Petitioner sought treatment from a chiropractor on December 18, 2020. Ex. 13 at 51. She reported that she had received her vaccination "in the wrong spot," and had experienced "immediate burning pain." *Id*. She reported having oral steroids and two injections, with the second being helpful. *Id*. On exam, her range of motion was limited. *Id*. at 52. She attended six total sessions between December 18, 2020 and January 18, 2021. *Id*. at 51-57. At her last session, she reported "feeling about the same." *Id*. at 57. Her range of motion remained "moderately reduced with pain noted." *Id*. The chiropractor noted that she "continue[d] to struggle with pain, discomfort, and limitations while at work and performing activities of daily living," and "still [had] significant residual pain at this time." *Id*.

There is a subsequent, almost one-year gap in treatment. On November 24, 2021, Petitioner saw a psychologist for symptoms of depression, and explained that she felt

"like past experiences at the VA had been frustrating, especially [with regard to] long-term pain resulting from a flu shot in her shoulder." Ex. 20 at 214. That same day, she reported "pain in arm and achiness from her COVID booster."[5] *Id*. at 215.

Petitioner had abdominal surgeries for issues unrelated to her left shoulder pain on September 23, 2021 and December 30, 2021. *See* Ex. 16 at 78; Ex. 19 at 150, 156.

Petitioner was treated for cervicalgia beginning in December 2022 (23 months after her last treatment for shoulder pain). *See* Ex. 19 at 344. During an appointment with a new PCP, Petitioner stated that she wanted "to discuss "bursa pain in left? shoulder post last immunization [sic]." *Id*. at 366. She reported "tightness of bilateral shoulders and base of neck." *Id*. at 344. She was referred for massage therapy and acupuncture for her neck pain. *Id*. at 383.

On March 1, 2023, Petitioner saw a chiropractor for a consultation for cervicalgia and received acupuncture treatment. Ex. 19 at 405; 577.

She returned to her PCP on March 28, 2023 with reports of neck and back pain, and "persistent shoulder pain" since "an immunization injection in 2019 in her left shoulder." Ex. 19 at 446. She was referred to a chiropractor. *Id*. at 44. She had one additional chiropractic treatment for neck and upper back pain on April 17, 2023.[6] *Id*. at 493.

*Witness Statements*

Petitioner's friend, Jennifer Brown, filed a declaration in which she stated that she coached softball with Petitioner in April 2021. Ex. 17 at ¶2. Ms. Brown stated that Petitioner was unable to "physically participate [in practices], and had to coach from the sideline." *Id*. She noted that if Petitioner "threw a ball or swung a bat, her pain would increase." *Id*.

Petitioner's former colleague, Andrew Horton, also filed a declaration. Ex. 18. He stated that Petitioner had trained him "in [his] current position" over the course of two years. *Id*. at ¶1. He recalled Petitioner's vaccination, and "noticed that she was very uncomfortable throughout the day." *Id*. at 2. He stated that she continued to suffer shoulder pain "throughout the rest of the time [they] worked together, through the end of 2021." *Id*. at ¶4.

---

[5] Petitioner received Covid-19 vaccinations on December 27, 2020, January 27, 2021, and November 23, 2021 (the day before this visit). Ex. 20 at 71. None of the records reveal the site of vaccination.

[6] This record indicates that Petitioner "was previously seen her 03/25/23 for a massage therapy authorization," however, no records of massage therapy have been filed. Ex. 19 at 493.

## III. Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering

such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

## IV. Findings of Fact - Severity

To satisfy the statutory severity requirement in this case, Petitioner must demonstrate that her symptoms more likely than not continued until at least Apil 1, 2021 – six months after the onset of her pain on October 1, 2020 (the day of vaccination). *See* Ex. 13 at 51. The record establishes (and the parties agree) that Petitioner's initial treatment for her shoulder pain continued unbroken through January 18, 2021 – a period of three months and 17 days. *See* Br. at 6; Resp. at 2. Thereafter, Respondent contends, Petitioner did not seek further shoulder-specific treatment for more than 23 months, and then only for symptoms more akin to her pre-vaccination neck pain than to her post-vaccination shoulder pain, "which supports a finding that Petitioner's symptoms resolve prior to the six-months post-onset date." Br. at 2-3.

This argument, however, fails to carefully analyze the record evidence. On December 8, 2020, Petitioner received a second cortisone injection to her left shoulder (after the first one in November did not provide relief). *See* Ex. 2 at 4. When she began therapy on December 18, 2020, Petitioner reported that the second injection had been helpful" and treatment thereafter yielded improvement. *See* Ex. 13 at 51. At her last visit

on January 18, 2021, however, she "continue[d] to struggle with pain, discomfort, and limitations while at work and performing activities of daily living" and "still [had] significant residual pain at this time." *Id*. at 57. Given that Petitioner continued to have ongoing symptoms at that time, even though they had improved with the second injection and therapy, it is probable that those symptoms continued for some period of time thereafter.

Petitioner's witness statements also help corroborate the conclusion that her symptoms persisted into the spring of 2021. The declaration from her friend, Jennifer Brown, with whom she coached her daughter's softball team in April 2021, establishes that Ms. Brown observed Petitioner experience an increase in shoulder pain when throwing a ball or swinging a bat. Ex. 7 at ¶2. Although Respondent disputes how throwing a ball could increase Petitioner's left shoulder pain because she is right-handed, the declaration is clear that the pain also occurred when swinging a bat, a two-handed activity. *Id.*; Resp. at 5. Respondent further argues that Ms. Brown's affidavit does not indicate whether the pain she observed was bilateral or specific to her left shoulder. *Id*. But Ms. Brown is clear that the pain she observed was after Petitioner's vaccination, and that she never observed Petitioner in pain prior to that time. Ex. 17 at ¶4. Further, Ms. Brown's declaration is not inconsistent with the prior medical record which indicated that Petitioner continued to have "significant" pain on January 18, 2021, including with range of motion (such as throwing a ball or swinging a bat). The balance of evidence thus supports severity – although only *very slightly*.

Thus, I find that it is more likely than not that Petitioner continued to suffer the residual effects of her vaccine-related injury thorough at least April 1, 2021 – satisfying the statutory severity requirement. I do not, however, find that residual effects of the injury can be established *beyond* this date – contrary to Petitioner's contention that her shoulder pain "likely endured through the end of 2021," as indicated by Mr. Horton's declaration. Br. at 9. The plethora of medical records after April 1, 2021 in which Petitioner sought treatment for other medical issues suggests that she could have returned to treatment if her symptoms required it. And the silent, almost one-year treatment gap does not permit the conclusion that Petitioner was struggling with shoulder pain in this period (especially given the intervening vaccines she received). Any damages award in this case will give no consideration to treatment costs or pain and suffering experienced/incurred after April 2021.

## V. Ruling on Entitlement

### A. *Requirements for Table SIRVA*

Respondent has not contested Petitioner's proof on the elements of a Table SIRVA. *See* Rule 4(c) Report at 14-15; *See also* 42 C.F.R. § 100.3(c)(10)(i)-(iv).

Therefore, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury.

B. *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received a flu vaccine in her left arm on October 1, 2020. Ex. 5 at 80; Section 11(c)(1)(A) (requiring receipt of a covered vaccine). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. Amended Petition at ¶13-14; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master